Thank you very much, Your Honor. It may please the Court, Robert Little on behalf of Jangle Vision. I'd like to reserve six minutes for rebuttal. Great. Thank you, Your Honor. And joining me at council table is my colleague, Dennis Loomis, and in the courtroom is the artist who created the Jangle Vision twins, Claudia DeRoma. The purpose of copyright law is to protect and control the ownership, use, and distribution of creative and expressive works. As the district court here itself acknowledged, the Jangle Vision twins created by Ms. DeRoma are titled to broad copyright protection. And the court did that in its decision at ER 85-86. What shifted was, in applying rent-me-ster, there was a deconstruction of the elements of the Jangle Vision twins. And the plaintiff was taken to task for not adequately describing which of the elements of the Jangle Vision twins were entitled to copyright protection, such that they were substantially similar to the infringing works, Wang's works, the women in the martini glasses. And I think that the best way of describing what happened here when I directed the court's attention to Exhibit 18 that was submitted by Wang, and that's at ER 256-261, there's a set of various images. There's Catwoman. There's Rubberman. There's Halloween costume, generic examples of what the district court and what Wang characterized as a woman in a bodysuit wearing a mask. Let us know at your honors what we believe the Jangle Vision twins are. We believe they are imaginary characters created by the artist's vision of what the, in her work, the universal woman would look like. So if we were to take, for example, the iconic image of Mickey Mouse, and yes, Your Honor. Let me just take you back to where we are procedurally. Yes, Your Honor. So the district court granted 1286, right? Yes, Your Honor. And it said as a matter of law, what you've alleged in your complaint doesn't constitute, you can never prevail on a claim of violation of the copyright act. Correct, Your Honor. Okay. So what, so the district court said those allegations, you look at those allegations in the complaint and the reference, all the things you can look at, properly look at on a motion to dismiss. What did you allege was the violation? The violation was the taking of the Jangle Vision twins, which were submitted to the defendant, Wang, at the time that DiRoma was applying for a job with Wang as a graphic designer. Well, I got that. Yes, Your Honor. Okay, but what about, I guess what I'm trying to get at is what did Wang, what was it about their, I don't really want to call them, but their advertisements. Yes. What was it about them that you contend constituted improper copying? And, Your Honor, I think there's a bullet point list, and it appears in the record at ER 67 and 60, excuse me, 66 to 67. Was that in the complaint? That was in a supplemental briefing. Well, my question was directed to the complaint because you're asking, the plaintiff, the defendants were asking the district court to look at the allegations of the complaint, correct? Yes, Your Honor. Right? Yes, Your Honor. 46 is all about it. Yes, Your Honor. Okay, so my concern is where did the district court go wrong in looking at the complaint such that it concluded, as a matter of law, what you've alleged doesn't constitute a violation of the copyright law? That's my concern. And just as you would agree with me, Your Honor, that if we put two images together and we say these are substantially similar and here's Wang. All right, so what did you allege in the complaint about that? That the Daniel Vision twins were, when you take them and you put them next to the characters, the infringing characters that appear in Wang's work, they have the same skins, the same palate, the same, and I mean the color, the same shape, the elongated torso, the elongated limbs, the same facial features. And what happened was the district court looked at, well, there's these small differences. The facial coverings, the eye openings are different. The eye openings are different. These small differences were focused on and what happened was when we described to the district court the various things that we thought were substantially similar, the head shape, the torso, the skin color, the number of characters, the hand positioning, all alleged in the complaint which, as Your Honor, agrees are taken as true at the pleading stage. What happened is the, Wang then said they're trying to seek copyright protection on heads and skins and skin color. And positioning and torso and none of these things, these body parts are copyrightable. That was air. That is like taking an image of, for example, I was getting there, but Mickey Mouse and saying Mickey Mouse has a tail. And so what is it about tails are not copyrightable expression? Mickey Mouse has black shorts on in the Steamboat Willie image. Black shorts are copyrightable and essentially took each of the elements that we say essentially are creative composition. The collection of those elements are substantially similar. And as I put in the brief, when you look at the Sarat, for example, when you stand back and you look at it, you see a composition of many elements that come together to create a creative work. But when you get closer, during the deconstruction process of saying the tail, and here it was the torso, the shape of the eyes, the skin, what happened was by a reductive reasoning we essentially just called them, not us, at the suggestion of Wayne, called them dislimited body suits wearing masks. That is not what the Django vision twins are. There is nothing in reality that is like the Django twins. And when I say that, I'm saying it's very exhibiting. We see Catwoman mixed up with Rubberman and so on. And these characters are distinct. And yet Wayne advanced those characters as examples of what a trope it is, how commonplace it is, how stock it is for a woman in a body suit wearing a mask. And, Your Honor, that's where we think the district court got it wrong because as it deconstructed those elements and viewed them in isolation, then essentially there was no creative work at all because the composition had essentially been deconstructed into its individual parts looked at in isolation as opposed to the sum of its parts looked at as a whole. I thought that that is what Rentmeister required the court to do, which is to filter out the unprotectable elements. I guess I'm not following how your argument matches up with what the law required the district court to do here. Yes, Your Honor. Judge Stronis, absolutely, Rentmeister does lay out the correct explication of the extrinsic test. That is true. It is very, very difficult, as we argued in the brief, it is difficult to apply Rentmeister involving the photographs. I would fully agree. The extrinsic test involves looking at the elements that are not similar and looking at, in other words, the differences, and looking at the elements that are similar. And in Rentmeister, they were looking at a two-dimensional static photograph. And that photograph, the reason that's important, Your Honor, is photographs are depictions of real life. So, there's very, when we look at the two photographs in Rentmeister, we're looking at, in Rentmeister, they identified it. A basketball, a basketball hoop, the color of Michael Jordan's skin, the grand jete of him as he's dunking the basket. Those things needed to be filtered out. Here, Your Honor, what I'm saying is the jangle vision twins in composition, there are no elements that are so commonplace that they need to be filtered out. Well, but the idea of a figure in a latex suit or a skin tight rubber suit, I mean, why doesn't that have to be filtered out? I mean, that's a common, that's a common idea. That's exactly what Wayne said. And that's exactly, Your Honor's identifying exactly what we disagree with. That the jangle vision twins are simply women in latex body suits with masks. I'm trying to get at it as what about them is unique. I mean, I think that the law would require us to filter out the body suits, filter out the postures, filter out the openings for eyes and mouth. What is, what's left that's protectable? So if we did that to Mickey Mouse, if we filtered out the tail, and we filtered out the ears, and we filtered out the nose, and we filtered out the outfit, wouldn't we be left with just saying that Mickey Mouse is just a mouse? Just like in this process, if we filter out the skins, and I really do want to emphasize the composition of these elements, and I also want to say we do disagree that they are just women in a cloud in latex with face masks. That having been said, but if we were to filter out those elements from Mickey Mouse, we would be just left with a mouse. It would be impossible to say this, this character infringes on Mickey Mouse because it has a tail, it has ears, it has a nose, and so on. And the example we gave, the Bugs Bunny example, is the example of what happens when you take a static image like Bugs Bunny, and then you animate it. You put it in an animation. Are there going to be differences? Of course. So, for example, with respect to the Danglevision twins, the focus was our argument, our pleading, our allegation. The Danglevision twins, for example, are in a very unusual posture. That posture appears in the infringing work. Their response. Now, if you look at these different parts of this video, and there's 600 frames in a video, so in any given frame, the posture is going to change. But we identified frames in which the posture is the same. They would say, no, the posture, you can't copyright the idea of human posture. And we would say the posture itself is an expressive element of the Danglevision twins. Thank you. I just have one. So, in your view, where the district court made an error was in the filtering process? Are you suggesting that there's nothing here that's subject to filtering? Yes, I am, Your Honor. Okay. Or was it the district court doing what the law requires them to do, to filter out similar things? You're saying you go through a filtering process and filter out nothing. That sounds like what you're saying. You do filter out common elements. But what I'm saying is that the elements here are uncommon. The composition of those elements together are uncommon. I agree that we filter out common elements, like, for example, in Rentmeester, the basketball, the basketball hoop, and so on. I agree that we filter those out. And at the end of Rentmeester, what we were left was just a Michael Jordan in the Grand Jeté dunking a basketball. And that was it. It wasn't entitled to copyright expression. But there were photographs, Your Honor. There were graphical depictions that were wholly the creation of the artist. And so I think that is the difference or the problem here, is if we vote, I can't, of course, we've always applied the extrinsic testing copyright throughout circuits. The problem is when we apply it in the manner in which the district were applying it here, we end up with a trope of just a woman clad in latex wearing masks. And I do think it's very important. Well, I'm going to stop you because your time is up. We'll put three minutes back on the clock. Thank you very much, Yours. Thank you. Thank you. Thank you. Your Honors, this is an easy case to affirm. The district court judge got it right when he dismissed plaintiff's copyright infringement claim as a matter of law under the objective controlling extrinsic test. Because the works were in the record. They were capable of being compared. Remember, plaintiff's work is limited to a single sheet drawing two specific figures into specific outfits, into specific poses, into specific chairs against a blank white background. In contrast, defendant's works are two short linear videos. They feature martini glass-shaped pools filled with figures, different shapes, different anatomy, different expressions of gender, wearing different outfits, different backgrounds, moonlit sky, night in the background. The camera dramatically pans out and reveals that the figures in the pools are actually light sparkling on a distinctive handbag. Once the admittedly unprotectable idea of a human-like figure wearing a latex bodysuit and face mask is filtered out, and my friends already conceded below ER 350, that's an idea that has to be filtered out, is rightly filtered out. Once you filter out that idea, the protectable elements of expression here are dramatically different. So what are the protectable elements here? At best, plaintiff has the right to use her copyright to claim protection over the combination of the specific color of the outfits, the specific shape and location of the cutouts, the very specific pose in the specific chairs that they're in, in the specific setting or background, which in this case is floating in blank space. So you seem to be saying unless it looks exactly like what they produced, it can't be protected? It has to be substantially similar. Obviously, if you have a case with a verbatim copy-paste expression, that's not a case we'd be here arguing for a motion to decide. And what you just described would be something identical rather than substantially similar. Is there something substantially similar that you think would be infringing here? It would have to be something very, very close. You'd have to have similar figures in a similar style, right? Plaintiff's work is a map graphic comic book style. Similar cutouts, similar pose, similar chair. Now you can move around those different elements, take one or two things away, and we would have a harder case to bring on a motion to dismiss. It's not one factor, but the combination of factors here are all expressed dramatically differently in the way it works. The styles are different. The outfits are different. The colors are different. The cutouts are different. The setting is different. The expression of gender, right? One's figures are clearly female figures. Plaintiff has touted throughout the complaint these are androgynous figures. Gender is expressed differently. The outfits are different. So, you know, in this case, there's no verbatim copy-paste expression. And what we do have as expressed is just completely different in terms of how the thing looks and then the appearance of it. So, you know, in our case, when we talk about fraud, the alleged item that was copyrighted is entitled to fraud protection in some instances, and others it's entitled to thin protection. You know, we have these words. Those become important, at least in our circuit, at the intrinsic phase of the case if you get there. But let me just ask you, do you think this, their items that they're seeking protection for, are they entitled to broad protection or thin protection? You seem to be suggesting it would just be sort of thin, very limited, almost identical because there's very little variation that could, that an alleged infringer could do to violate the protected elements. We do believe these works are entitled to thin protection. Remember, they are fictional depictions, but they reflect human anatomy. These figures are clearly designed to be human. They're wearing outfits that are commercially available. Plaintiff didn't invent these outfits. The chairs, classic chairs, you could purchase them in a store. But either way, you skin the cat. And, you know, the district clerk gave plaintiff the benefit of the doubt. Gave plaintiff the benefit of the doubt. Said, you know, for purposes of the motion to dismiss, we'll grant you broad protection. Just like in Westminster, having thin or broad protection is in case dispositive, and it is in case dispositive in this case because whether we're looking at these figures for virtual identity or substantial similarity, plaintiff can't meet either standard. So from your perspective, that's not an issue we have to really address in this case? You could affirm and maintain a motion to dismiss-based finding of broad protection and easily dismiss for lack of substantial similarity, just like was done in Westminster. Your Honors, just a few quick things to note. I noted in my intro my colleagues seem to be backtracking. My friend said, you don't have to filter out the idea of a figure in a bodysuit. That's already been conceded below ER 350. It was also reiterated in their brief. Another quick clarification, the purpose of copyright, this comes from the Constitution, Congress, the Supreme Court in place. The purpose of copyright is to incentivize the creation of new things. We give authors limited monopolies. They're powerful monopolies, but they are designed to be limited to protectable elements of expression. Copyright is not designed for plaintiffs, big or small, right? This plaintiff is a small entity. Lots of plaintiffs are large ones. Copyrights are not designed to enable plaintiffs to monopolize ideas and unprotectable elements, anatomical figures. Those things have to stay in a public domain. All right. I don't think we have any questions for you, so unless you have other points to make, thank you very much. Thank you, Your Honor. Thank you, Your Honors. Okay. We'll give you three minutes. Thank you very much, Your Honors. So had Claudia DeRoma been hired by Valencia Aga or Tom Ford at Gucci or Helmut Lang and created these characters after the Lang video had hit the social media and created a blitzkrieg regarding these rhinestone encrusted handbags, we know that these two places would be reversed, that they would contend that the Django Vision twins infringe on their characters lounging around in martini glasses. I think that the distinction, I disagree with my friend on the other side, that the distinction between Brad and thin copyright protection is not important here. I think Judge Colon's question, and then the panel followed up, is I do think that they are saying that these need to be identical, which does suggest that they think that the Django Vision twins are entitled to thin copyright protection. And I would agree we cannot copyright the idea of a woman in a body suit wearing a mask. I'm sure there are lots of Halloween costumes that depict that. But at the same time, Your Honors, we know, Your Honors know, the folks in this courtroom know, we know the difference between Catwoman and just some suit, a generic suit on Amazon. We know when we see Catwoman, there was someone else in there named Rubberman, I don't know who that is, but he looks different from these elements that are on, or these other images that were depicted that are distinct characters. Our argument is these are distinct characters. In answer to your question, Judge Paz, regarding, is there anything to be filtered out? Because the Django Vision twins are highly original, and the district court said as much, that they were entitled to broad copyright expression. Nothing in that work, the Django Vision work, is dictated by a specific theme or subject matter. And by that I mean they aren't like unicorns, which would be thin. You know a unicorn just by the horn. They're not Tyrannosaurus rex or dinosaurs where you take out the elongated nose with the flash of teeth and they are no longer, it's no longer a dinosaur. Or you take out a dolphin, you take off its fin and it's no longer a dolphin. Those things of course are thin, there are limited ways of expressing it. In this case, with the Django Vision twins, there are countless, numerous ways of expressing this particular imaginary character. And because of that, we would ask that the district court, excuse me, we would ask your orders to reverse the order granting the Rule 12b-6 and with directions in our new and different order denying the Rule 12b-6 so that we can conduct discovery and present expert testimony that would help us and bring us to the MSJ stage. Thank you very much, Your Honors, for your time and attention. Thank you. We thank both counties for their arguments this morning. This case is now submitted. Our court stands in recess until tomorrow morning. Thank you. Thank you, Your Honors. All rise. This court for this session stands adjourned.
judges: PAEZ, THOMAS, Collins